**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION**

| | |
|---|---|
| JESSE VARGAS, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) |
| | ) NO. 2:14-CV-288 |
| LAKE COUNTY POLICE DEPARTMENT; | ) |
| SHERIFF JOHN BUNCICH, solely in | ) |
| his official capacity as Lake | ) |
| County Sheriff; HENRY WORONKA, | ) |
| individually and in his official | ) |
| capacity, | ) |
| | ) |
| Defendants. | ) |
| | ) |

## OPINION AND ORDER

This matter is before the Court on the Sheriff Defendants'
Motion for Summary Judgment, filed by Defendants Lake County Police
Department and Sheriff John Buncich in his capacity as Lake County
Sheriff (together, "Sheriff Defendants"), on January 26, 2017 (DE
#56), and on Defendants' Motion for Summary Judgment, filed by
Defendant Henry Woronka ("Woronka"), on January 30, 2017 (DE #61).
For the reasons set forth below, the Sheriff Defendants' motion
for summary judgment (DE #56) is **GRANTED IN PART** and **DENIED IN
PART**. The motion is **GRANTED** as to: (1) all claims against John
Buncich; (2) the Title VII claims of sex discrimination, disparate
impact, disparate treatment, training, and promotion in Count I;
and (3) Counts II-VI against the Lake County Police Department.

These claims are **DISMISSED**.  The motion is **DENIED** as to the Title VII claims of hostile work environment and retaliation against the Lake County Police Department in Count I.  Woronka's motion for summary judgment (DE #61) is **GRANTED**.  Counts I-VI against Woronka are **DISMISSED**.

<u>BACKGROUND</u>

Plaintiff Jesse Vargas ("Vargas") is a Latino police officer employed by the Lake County Sheriff's Department ("Sheriff's Department").  On August 20, 2012, defendant police officer Commander Woronka called Vargas a "fat Tomato Picker" and insulted him while in the patrol sergeant's office.  Their conversation escalated to a physical altercation that was broken up by other officers.  Vargas filed an internal complaint against Woronka about this altercation, indicating that Woronka had been harassing him on a daily basis, calling him "Beaner, Puerto Rican, Bean counter or Field worker."  In response to Vargas' complaint, defendant Sheriff John Buncich ("Buncich") demoted Woronka from his rank of Commander and suspended him without pay for fifteen days.  Woronka resigned from the Sheriff's Department soon thereafter.  Vargas filed an EEOC Charge of Discrimination against the Sheriff's Department regarding Woronka's harassment and the altercation, asserting claims of discrimination based on his race, color, national origin, and retaliation.  After filing the internal

complaint and EEOC Charge, Vargas repeatedly requested promotion to the rank of corporal, but was not promoted.

Vargas' Amended Complaint ("Complaint") alleges violations of Title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e-2 (Count I); violations of 42 U.S.C. § 1981, including retaliation under Section 1981 (Count II); failure to train under Section 1981 (Count III); violations of 42 U.S.C. § 1983 (Count IV); failure to train resulting in violations of Section 1983 (Count V); and violation of Article I, Section 23 of the Indiana Constitution (Count VI). (DE #58-1.) On January 27, 2017, upon stipulation of the parties, the Court dismissed the claims against Woronka in his official capacity. (DE #60.) The Sheriff Defendants and Woronka filed motions for summary judgment. These motions have been fully briefed and are ripe for adjudication.

DISCUSSION

Standard

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Not every dispute between the

parties makes summary judgment inappropriate; "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id*. In determining whether summary judgment is appropriate, the court must construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor. *Ogden v. Atterholt*, 606 F.3d 355, 358 (7th Cir. 2010). "However, our favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013) (citation omitted).

While the movant bears the initial burden of production to inform the district court why a trial is not necessary, these requirements "are not onerous" where the nonmovant "bears the ultimate burden of persuasion on a particular issue." *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). A party may move for summary judgment based on either "affirmative evidence that negates an essential element of the nonmoving party's claim" or by "asserting that the nonmoving party's evidence [is] insufficient to establish an essential element of the nonmoving party's claim." *Id*. at 1169 (citation and internal quotations omitted). A party opposing a properly supported summary judgment motion may not rely on allegations or denials in his own pleading, but rather, must "marshal and present the court with the evidence [he] contends

will prove [his] case." *Goodman v. Nat'l Sec. Agency, Inc.,* 621 F.3d 651, 654 (7th Cir. 2010). If the nonmoving party fails to establish the existence of an essential element on which he bears the burden of proof at trial, summary judgment is proper. *Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

Material Facts

The Parties

Vargas is a police officer employed by the Sheriff's Department since 1996.[1] His race is Mexican and of Hispanic origin. During the time period at issue, Vargas was assigned to the Patrol Division. Buncich served his first term as Sheriff of Lake County from 1995 to 2002. He began his second term as Sheriff in 2011, and served in that position during the time period at issue. As Sheriff, Buncich had exclusive authority to appoint commanders and deputy commanders, and was the final decision-maker on promotions, discipline, and transfer of assignments for Vargas.

---

[1] The Court notes that while "Lake County Police Department" is named as a defendant and Vargas' employer in the Complaint (DE #58-1 at 2, ¶4), the record indicates that Vargas' employer is the Sheriff's Department. (*See* DE #58-5 (EEOC Charge against the Sheriff's Department); DE #68-7 at 2, 6 (Sheriff's Department performance evaluation reports for Vargas); *see also* DE #58-2 at 9 (Vargas' testimony that "the defendants" meant "the Sheriff's Department," Woronka and Buncich).) Because the parties do not address this inconsistency, the Court assumes that the two entities are affiliated. (*See, e.g.,* DE #68-6 (Buncich's response to requests for admission regarding "Vargas, of the Lake County Police/Sheriff's Department").)

Woronka was a police officer employed by the Sheriff's Department from 1977 to September 2012. Buncich appointed Woronka to the position of a Deputy Commander of the Uniformed Patrol during his first term as Sheriff. During his second term, Buncich appointed Woronka to the position of Commander of the Detective Bureau. Woronka had little or no direct supervisory authority over Vargas because he was in a different division. Woronka did not have authority to hire, fire, or discipline Vargas. He had no decision-making authority over Vargas' requests for promotions or assignments, and never made any recommendations concerning Vargas' promotions or assignments.

Municipal Policies and Discrimination Training

During the time period at issue, the Lake County Employee Handbook contained a policy prohibiting violence in the workplace, including any verbal or physical action that is communicated or perceived as harassment. (DE #58-6.) Under this policy, employees were to report threats to their supervisor or department head, and employees who violate this policy were subject to discipline. Lake County also had an Equal Employment Opportunity policy to recruit, hire, and promote for all job classifications without regard to race, color, and national origin. (DE #58-7.) This policy provided that discrimination by co-workers and supervisors would not be tolerated.

The Sheriff's Department General Order 2000-06 was a policy against harassment in any form, including racial and ethnic harassment. (DE #58-8.) The General Order provides that incidents of harassment are to be "reported immediately to the employee's supervisor and/or the Sheriff or Chief." (*Id.*) Any person who violated this anti-harassment policy would be subject to discipline. The Sheriff's Department Rules and Regulations 8.01.01 provided that no officer shall harass or verbally abuse anyone who files a complaint against an officer. (DE #58-9.)

Police officers participated in anti-discrimination training, though the record is unclear as to the substance and frequency of such training. Woronka testified that he participated in such training twice, and learned that "[t]imes have changed." (DE #68-1 at 30.)

Woronka's Alleged Misconduct

Sometime during Buncich's first term as Sheriff (between 1995 and 2002), Woronka called officers of Latino descent "spik, wetback, [and] beaner." (DE #68-1 at 40.) At that time, Chief Tom Downs told Woronka that he "need[ed] to watch his language." (*Id.*)

Between 2000 and 2002, the FOP Chris Anton Lodge ("Lodge") disciplined Woronka for referring to Officer Jesse Solomon as "Gomez." (*Id.* at 24-25.) Woronka maintains that the Lodge directed him to write a letter of apology to Officer Solomon, and

he did so.  Officer Troy Johnson ("Johnson") attests that Woronka was suspended from the Lodge as a result of this incident; Woronka denies that he was suspended.  Woronka believed that Buncich and the Sheriff's Department were aware of the incident, but Buncich denied knowledge of it.  The Sheriff's Department is not affiliated with the Lodge and did not take any action against Woronka for the incident.

Ten years later, sometime shortly before August 20, 2012, Johnson reported incidents of Woronka calling Johnson "ghetto Tyrone," an African American officer "Black Russian," and a Hispanic officer "wetback" to his Direct Commander Matthew Eaton and Deputy Chief Daniel Murchek ("Murchek").  (DE #68-2 at 1-2; DE #68-1 at 115.)  Murchek allegedly responded to Johnson's complaint by "stat[ing] that they were familiar with Hank Woronka's conduct, and that Hank Woronka is 'from the old school.'"  (DE #68-2 at 2, ¶17.)  No official action was taken against Woronka in response to Johnson's complaints.

On August 20, 2012, Vargas was in the Patrol Supervisors office with other officers.  Woronka entered the office, told Vargas he looked like "a fat Tomato Picker" and asked him "why don't you show these guys how you use [*sic*] to suck Dale Bock's dick."  (DE #68-3.)  Vargas called Woronka an "asshole."  (*Id.*)  Woronka attempted to kick Vargas and smacked him in the face.  Vargas grabbed Woronka from behind and put his arm around Woronka's

neck.  Lieutenant Brian Marsh ("Marsh") broke up this altercation ("August 20 altercation").  Woronka then came towards Vargas and shoved him, and the two began yelling at each other.  Officer Scott Bock observed the altercation and initially thought that Woronka and Vargas were "play fighting," but saw that Woronka became serious once they were separated.  (DE #58-4.)  One of the officers advised Vargas to leave the office, and he did.

Later that day, Vargas submitted an internal complaint to Commander William Paterson describing the August 20 altercation and explaining that "Woronka harasses myself on a daily basis," called Vargas "Beaner, Puerto Rican, Bean counter or Field worker" on several occasions, and would smack the back of Vargas' head or flick his ears.  (DE #68-3 at 1.)  Vargas maintained that he had not complained about Woronka's behavior before the August 20 altercation "because of fear of retaliation."  (*Id*. at 2.)  Marsh and Bock also submitted written accounts of the August 20 altercation.  The day after the August 20 altercation, Woronka approached Vargas and told him that "payback's a bitch."  (DE# 68-1 at 47.)  Vargas informed Paterson of Woronka's "paybacks a bitch" statement.  (DE #68-4.)

Woronka admits to calling Vargas "a wetback and a beaner and everything else," and to calling Officer Oreuta "f--king wetback," and Officer Oscar Martinez "spik."  (DE #68-1 at 32-34, 83.)  Woronka testified that his language was "mill talk," "jiving," or

"just screwing with" Vargas.  (*Id*. at 23-24.)  He thought Vargas was a friend, and never meant to hurt his feelings.  (*Id*. at 22.) Woronka testified that if he learned that his language was offensive to another person, he would stop using it with that person.  (*Id*. at 56-57; *see, e.g., id.* at 34, 36-37 (testifying that he had apologized to Officers Martinez and Johnson for offending them).

On September 5, 2012, Buncich found Woronka in violation of Sheriff's Department Rules and Regulations 7.07.05, which prohibited officers from verbally harassing fellow employees, and General Order 2000-006.  Buncich suspended Woronka without pay for fifteen days, removed Woronka from the position of commander, and demoted him to the permanent rank of captain.  Buncich testified that prior to the August 20 altercation, he was never notified that Vargas was subjected to racial harassment by anyone within the Sheriff's Department.

On September 11, 2012, Woronka resigned from the Sheriff's Department.  On September 14, 2012, Vargas filed an EEOC Charge of Discrimination ("EEOC Charge") against the Sheriff's Department. The EEOC Charge indicates that Vargas' allegations of discrimination are based on race, color, national origin, and retaliation, and that it is a continuing action.  The charge alleges:

Woronka, Commander of the Detective Bureau, harasses me because of my national origin. He calls me "tomato picker", "f--king wetback", "Beaner", "field worker", and other similar comments. On August 20, 2012, he physically assaulted me. I reported the harassment and attack to Commander W. Paterson and Deputy Commander B. Czerwinski. After I reported Woronka, he threatened me by saying, "Payback's a bitch, asshole." I am not the first person to report Woronka for harassment. Lake County Sheriff's Department has allowed Woronka to create a hostile work environment for me and other minority police officers.

I believe I have been harassed based on my national origin, Mexican, and retaliated against because I engaged in a protected activity in violation of my rights under Title VII. . . .

(DE #58-5.) After Vargas filed the EEOC Charge, the Sheriff's Department did not reduce Vargas' compensation or employment benefits, or change his employment status. Vargas testified that he has always performed his duties as a patrolman satisfactorily, despite any harassment by Woronka.

        Vargas' Requests for Promotion

After filing the EEOC Charge, Vargas repeatedly requested promotion to the rank of corporal, but was not promoted. As Sheriff, Buncich had the sole authority to appoint officers to the rank of corporal. His criteria for promotion to corporal were: seniority (including a minimum of five years of service), work performance, and the need within a division. In response to requests for admissions, Buncich denied that Vargas met all prerequisites to be promoted to corporal. Vargas testified that six corporal positions existed, and that of seven identified

corporals (including a recent retiree), three were "Hispanic, Mexican or half Mexican," two were African American, and two were Caucasian. (DE #58-2 at 14.)

Claims against Sheriff Buncich in His Official Capacity

The Sheriff Defendants argue that Buncich is entitled to summary judgment on all official capacity claims because these claims are construed as claims against the Lake County Police Department. Vargas fails to respond to this argument, and thus waives any argument that these claims are valid. *See Johnson v. Gen. Bd. of Pension & Health Benefits of United Methodist Church,* 733 F.3d 722, 729 (7th Cir. 2013) (holding that arguments not raised in opposition to a motion for summary judgment are waived); *Palmer v. Marion County*, 327 F.3d 588, 597–98 (7th Cir. 2003) (holding that a party abandoned his claim where he failed to delineate the claim in opposition to a motion for summary judgment); *Laborers' Int'l Union of N. Am. v. Caruso*, 197 F.3d 1195, 1197 (7th Cir. 1999) (stating that arguments not presented in response to a summary judgment motion are waived). A claim against a person's office is no different than a claim against the entity and is properly dismissed as duplicative. *See Thanongsinh v. Bd. of Educ.*, 462 F.3d 762, 771 n.7 (7th Cir. 2006). Therefore, the claims against Buncich in his official capacity are dismissed.

## Count I - Title VII Claims against Woronka in His Individual Capacity

Woronka argues that the Title VII claims against him individually in Count I must be dismissed. Vargas does not respond to this argument, presumably because Woronka is correct. "Title VII authorizes suit only against the employer. Individual people who are agents of the employer cannot be sued as employers under Title VII." *Passananti v. Cook County*, 689 F.3d 655, 662 n.4 (7th Cir. 2012). Because Woronka, in his individual capacity, does not fall within Title VII's definition of employer, the Title VII claims against Woronka in Count I are dismissed.

## Count I – Title VII Claims of Sex Discrimination, Disparate Impact, Disparate Treatment, Training, and Promotion

The Sheriff Defendants move for summary judgment on certain Title VII claims in Count I because they are outside the scope Vargas' EEOC Charge. "As a general rule, a Title VII plaintiff cannot bring claims in a lawsuit that are not included in [his] EEOC charge." *Vela v. Vill. of Sauk Vill.,* 218 F.3d 661, 664 (7th Cir. 2000). A plaintiff may pursue a claim not explicitly included in his EEOC charge "only if [his] allegations fall within the scope of the earlier charges contained in the EEOC complaint." *Ezell v. Potter*, 400 F.3d 1041, 1046 (7th Cir. 2005) (citation omitted). To determine if a claim meets this standard, the court considers "whether the allegations are like or reasonably related to those contained in the EEOC complaint. If they are, then we ask whether

the current claim reasonably could have developed from the EEOC's investigation of the charges before it." *Id*. (citation omitted). Claims are "reasonably related" when "there is a factual relationship between them." *Id*. (citation omitted). The EEOC charge and the complaint "must describe the same conduct and implicate the same individuals." *Id*. (citation omitted).

The Sheriff Defendants maintain that the Court should dismiss the following claims in Count I because they are outside the scope of Vargas' EEOC Charge: discrimination based on sex, disparate impact, disparate treatment, training, and promotion. In his response brief, Vargas does not address claims of sex discrimination, disparate impact, disparate treatment, or training.[2] By failing to address these claims, Vargas has waived any argument in support of them. *See Johnson*, 733 F.3d at 729; *Palmer*, 327 F.3d at 597–98. Therefore, Vargas' Title VII claims of discrimination based on sex, disparate impact, disparate treatment, and training are dismissed.

Vargas' promotion claim is more complicated. While Count I does not specifically allege a claim relating to promotion, it incorporates allegations that Vargas requested and was denied promotions to the rank of corporal after filing his internal and

---

[2] The training claim in Count I alleges that "Woronka's conduct . . . constitutes a training program that promotes discrimination because of race, color, or national origin." (DE #58-1 at 8, ¶62.)

EEOC complaints. (*See* DE #58-1 at 7, ¶¶50-51.) In his response brief, Vargas argues that Buncich denied that he was qualified for promotion to corporal because he is Mexican. But Vargas failed to respond to the Sheriff Defendants' outside-the-scope argument, and therefore waived this claim. *See Saket v. Am. Airlines, Inc.,* No. 02 CV 3453, 2004 WL 1064733, at *4 (N.D. Ill. Apr. 21, 2004) (granting summary judgment where plaintiff failed to address beyond-the-scope argument). Moreover, the EEOC Charge focuses on Woronka's harassment; it does not allege that Buncich failed to promote Vargas because of his race, ethnicity or national origin. "A failure to promote is a distinct act of discrimination." *Hale v. Bd. of Trs. of S. Ill. Univ. Sch. of Med.,* 219 F. Supp. 3d 860, 867 (C.D. Ill. 2016) (citation omitted). Because Vargas' promotion claim does not involve the same individuals or same conduct alleged in the EEOC Charge, it is outside the scope of the EEOC Charge.

Vargas also argues that the failure to promote him constituted retaliation for reporting Woronka and filing the EEOC Charge. The EEOC Charge indicates that Vargas' claim was based in part on retaliation, and describes Woronka's alleged threat that "[p]ayback's a bitch," after Vargas reported the August 20 altercation. (DE #58-5.) Vargas contends that the "Sheriff's department continued to make god [*sic*] on Woronka's [threat] by failing to promote Vargas to the rank of corporal" after he filed the EEOC Charge. (DE #69 at 15.) The Sheriff Defendants do not

assert that this retaliation claim is outside the scope of the EEOC Charge. Nor can they. "[R]etaliation for complaining to the EEOC need not be charged separately from the discrimination that gave rise to the complaint." *Horton v. Jackson County Bd. of County Comm'rs,* 343 F.3d 897, 898 (7th Cir. 2003) (citations omitted). To the extent Vargas alleges a retaliation claim based on the failure to promote him to corporal, such claim is not outside the scope of the EEOC Charge.

Count I – Title VII Hostile Work Environment Claim

Count I alleges that the Sheriff Defendants subjected Vargas to a hostile work environment in violation of Title VII. To survive summary judgment on a hostile work environment claim, a plaintiff must present sufficient evidence to raise a material issue of fact on four elements: (1) his work environment must have been subjectively and objectively offensive; (2) his race and/or national origin must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability, meaning either that a supervisor participated in the harassment or that the municipality was negligent in discovering or remedying co-worker harassment. *See Liu v. Cook County,* 817 F.3d 307, 318 (7th Cir. 2016). The Sheriff Defendants do not dispute that Woronka called Vargas racial slurs, or that the harassment was based on race and national origin. They argue that Vargas cannot demonstrate a basis for employer

16

liability, or that the alleged harassment was sufficiently
pervasive.

The basis for employer liability depends on whether the
alleged harassment was perpetrated by a supervisor or a coworker.
"An employer may be strictly liable for harassment by supervisors,
but a negligence standard applies for harassment by coworkers."
*Jajeh v. County of Cook*, 678 F.3d 560, 568 (7th Cir. 2012)
(citation omitted). For purposes of Title VII, a "supervisor"
must have "the power to directly affect the terms and conditions
of the plaintiff's employment." *Id*. (citation omitted). The
Sheriff Defendants maintain that Woronka was not Vargas'
supervisor because he did not have the authority to hire, fire or
discipline Vargas, or transfer his duty assignment. Vargas does
not argue that Woronka was his supervisor, and thus, the Court
will consider Woronka to be Vargas' co-worker for the purpose of
this analysis.

An employer may be liable for failing to remedy a hostile
work environment created by a co-worker if it "was negligent in
either discovering or remedying the harassment." *Id.* at 569
(citation omitted). Vargas must "demonstrate that he notified the
employer about the harassment or that the harassment was so
pervasive that a jury could infer his employer knew about it."
*Andonissamy v. Hewlett-Packard Co.,* 547 F.3d 841, 849 (7th Cir.
2008) (citation omitted). Courts generally do not consider an

employer to be aware of workplace harassment "unless the employee makes a concerted effort to inform the employer that a problem exists." *Jajeh*, 678 F.3d at 569 (citation omitted). Vargas admits that he did not complain about Woronka's harassment prior to the August 20 altercation, claiming that he feared retaliation. But "an employee's subjective fears of confrontation, unpleasantness or retaliation do not alleviate the employee's duty . . . to alert the employer to the allegedly hostile environment." *Porter v. Erie Foods Int'l, Inc.,* 576 F.3d 629, 638 (7th Cir. 2009) (citations and internal quotation marks omitted). When Vargas complained after the August 20 altercation, Buncich demoted Woronka, removed him from his position as commander, and suspended him for fifteen days without pay. *See Jajeh*, 678 F.3d at 569 ("Once an employer is aware of workplace harassment, it can avoid liability by taking prompt and appropriate corrective action reasonably likely to prevent the harassment from recurring."). Vargas does not dispute that Woronka was disciplined promptly after he complained about the August 20 altercation. Rather, he focuses on Woronka's harassment leading up to the August 20 altercation.

Vargas cites evidence that the Lodge disciplined Woronka between 2000 and 2002 for referring to Officer Jesse Solomon as "Gomez." (DE #68-1 at 24-25). It is undisputed that the Lodge is not affiliated with the Sheriff's Department, and that the Sheriff's Department did not take any action against Woronka for

this incident. Vargas also proffers evidence that sometime during Buncich's first term as Sheriff (between 1995 and 2002), Chief Downs told Woronka to "watch his language" in response to his calling officers of Latino descent "spik, wetback, [and] beaner." (DE #68-1 at 40.) Both of these incidents occurred at least ten years before Woronka's harassment of Vargas, and are too remote to support a finding that the Sheriff Defendants had constructive knowledge of Woronka's harassment of Vargas.

Vargas maintains that between January 2011 and August 20, 2012, Woronka harassed him on a daily basis, using racial comments such as beaner, Puerto Rican, bean counter or field worker, and smacking the back of his head or flicking his ears. Woronka admits he called Vargas "wetback" and "beaner," and that he called Officer Oreuta "wetback," and Officer Martinez "spik." (DE #68-1 at 24, 32-34, 83.) Vargas also presents evidence that before the August 20 altercation, Johnson reported incidents of Woronka calling Johnson and two other officers "ghetto Tyrone," "Black Russian," and "wetback." (DE #68-2 at 1-2; DE #68-1 at 115.) Deputy Chief Murchek allegedly responded to Johnson's complaint by saying that "they were familiar with Hank Woronka's conduct, and that Hank Woronka is 'from the old school.'" (DE #68-2 at 2, ¶17.) No corrective action was taken as a result of Johnson's complaint.

If a factfinder believes that supervisors knew about the hostile work environment, the argument that the Sheriff Defendants

did not know, and could not have known, about Woronka's harassment may be weakened. *See Hawkins v. Groot Indus., Inc.,* No. 01 C 1731, 2003 WL 1720069, *5 (N.D. Ill. Mar. 31, 2003) (finding that a jury must weigh evidence of supervisors' awareness of harassment and make credibility determinations regarding the employer's knowledge of it). Considered in the light most favorable to Vargas, the evidence suggests that the Sheriff's Department was aware that Woronka was calling fellow officers racial slurs. Therefore, the Court finds a genuine issue of material fact exists as to whether the Sheriff Defendants had constructive knowledge of Woronka's harassment of Vargas.

The Sheriff Defendants also argue that Woronka's harassment of Vargas was not so pervasive as to rise to the level of a Title VII violation. In assessing the pervasiveness and severity of the offensive conduct, both Vargas and the Sheriff Defendants rely on *Minority Police Officers Association v. City of South Bend, Indiana,* 617 F. Supp. 1330, 1352 (N.D. Ind. 1985). *Minority Police* holds that offensive racial epithets do not rise to the level of a Title VII violation unless the working environment is "dominated by racial slurs." *Id.* at 1353. More recently, the Seventh Circuit explained that "although a workplace need not be 'hellish' to constitute a hostile work environment, . . . [the] environment must be so pervaded by discrimination that the terms and conditions of employment are altered." *Alamo v. Bliss*, 864 F.3d 541, 550

(7th Cir. 2017) (internal citations, quotation marks and brackets omitted).

> There is no "magic number" of instances or type of slur that indicates a hostile work environment. Instead, we look to the "pervasiveness and severity" of language used, which we have described as being "inversely related." A "severe episode" that occurs "as rarely as once" and a "relent-less pattern of lesser harassment" both may violate Title VII.

*Id.* (internal citations omitted); *see Cerros v. Steel Techs.,* 288 F.3d 1040, 1047 (7th Cir. 2002) (recognizing that an "unambiguously racial epithet falls on the 'more severe' end of the spectrum"). "Offhand comments, isolated incidents, and simple teasing do not rise to the level of conduct that alters the terms and conditions of employment." *Scruggs v. Garst Seed Co.*, 587 F.3d 832, 840–41 (7th Cir. 2009) (citation omitted). Courts consider the totality of the circumstances in determining whether conduct is sufficiently severe or pervasive to be actionable, including: "(1) the frequency of the discriminatory conduct; (2) how offensive a reasonable person would deem it to be; (3) whether it is physically threatening or humiliating conduct as opposed to verbal abuse; (4) whether it unreasonably interferes with an employee's work performance; and (5) whether it was directed at the victim." *Nichols v. Mich. City Plant Plan. Dep't*, 755 F.3d 594, 601 (7th Cir. 2014) (citation omitted).

The Sheriff Defendants contend that Vargas fails to provide specific examples of Woronka's allegedly daily harassment to

demonstrate that his comments pervaded Vargas' work environment. They cite *Williams v. Arrow Chevrolet, Inc.*, 121 F. App'x 148 (7th Cir. 2005), in which the Seventh Circuit affirmed summary judgment on a hostile work environment claim where the plaintiff claimed that he was subjected to racial slurs daily and referred generally to "O.J. jokes, Martin Luther King jokes, Farrakhan jokes," but only described a single utterance of an offensive epithet directed at a customer. *Id.* at 149-50. In contrast, here Woronka admits to calling Vargas and other officers a variety of racial slurs, including "wetback," "Puerto Rican," and "spik." *See Rodgers v. W.-S. Life Ins. Co.*, 12 F.3d 668, 671-73 (7th Cir. 1993) (finding an actionable hostile work environment when supervisors and employees referred to an employee by a racial slur between five and ten times); *Alamo*, 864 F.3d at 550 (noting that the racial slurs "spic" and "f--king Puerto Rican" are "severe"). "Where a hostile work environment claim involves ongoing conduct, a plaintiff need not date stamp every incident." *Hawkins,* 2003 WL 1720069, at *2 (finding that plaintiff's testimony that he was subjected to racial epithets on a daily basis raised an issue of fact regarding the level of racial hostility in the employer's work environment) (citation and internal quotation marks omitted). The Sheriff Defendants also argue that Woronka's racial comments to other officers do not prove that Vargas was subject to a hostile work environment. While Woronka's calling other officers racial

slurs would not have the same impact on Vargas as Woronka's comments to him, they are not irrelevant to the hostile work environment claim. *See Smith v. Ne. Ill. Univ.,* 388 F.3d 559, 567 (7th Cir. 2004) ("While certainly relevant to the determination of a hostile work environment claim, when harassment is directed at someone other than the plaintiff, the impact of [such] 'second-hand harassment' is obviously not as great as the impact of harassment directed at the plaintiff.") (internal quotation marks omitted).

It is a close call as to whether Vargas has met his burden to show pervasiveness. On the one hand, there is no dispute that Woronka's conduct was offensive and was directed at Vargas. Woronka admits that he called Vargas and other officers a variety of racial slurs. His testimony, along with evidence of Murchek's alleged response to Johnson's complaints that they were familiar with Woronka's conduct, indicates that Woronka's use of racial slurs was not an isolated incident. On the other hand, Vargas testified that he was able to perform his duties as a patrolman throughout his employment satisfactorily, despite Woronka's harassment. And while Woronka's offensive comments culminated in the August 20 altercation, Vargas does not claim that Woronka's harassment was physically threatening. Considering the evidence in the light most favorable to Vargas, the Court finds that he has offered sufficient evidence such that a factfinder could determine

that Woronka's harassment was pervasive.  The Sheriff Defendants'
motion for summary judgment on the Title VII hostile work
environment claim is denied.

Count I – Title VII Retaliation Claim

Vargas argues that he has established a *prima facie* case of
retaliation under Title VII.  "A retaliation claim arises when an
employee engages in activity protected by Title VII and suffers an
adverse employment action as a result." *Ferrill v. Oak Creek-
Franklin Joint Sch. Dist.,* 860 F.3d 494, 501 (7th Cir. 2017).  The
parties do not dispute that Vargas engaged in protected activity
by reporting Woronka and filing the EEOC Charge.  The issue is
whether Vargas' protected activity is causally linked to an adverse
employment action.

The Sheriff Defendants initially argue that Vargas cannot
prevail on a Title VII retaliation claim because he has no hostile
work environment claim, and thus, no materially adverse employment
action. *See Yuhe Diamba Wembi v. Metro Air Serv.*, 195 F. Supp. 3d
957, 968 (N.D. Ill. 2016).  Vargas does not respond to this
argument.  Rather, he maintains that the adverse employment action
was the failure to promote him to the rank of corporal.[3]  "The
denial of a promotion can be an adverse action for purposes of a

_____

[3] Vargas also mentions that the Sheriff Defendants retaliated
against him by failing to transfer him to other units, but fails
to cite evidence supporting this claim.

retaliation claim." *Poullard v. McDonald*, 829 F.3d 844, 858 (7th Cir. 2016) (citation omitted).  Vargas proffers evidence that (1) the Sheriff has the exclusive right to appoint an officer to the rank of corporal, (2) an officer must have five years of service before being considered for the rank of corporal, and (3) the criteria for the position are work performance, seniority, and the need within a division.  It is undisputed that Vargas had more than five years of service with good work performance and repeatedly sought a promotion to corporal, but other officers were promoted to corporal in his division.  In response to requests for admissions, Buncich denied that Vargas met all prerequisites to be promoted to corporal.  Vargas maintains that Buncich denied that Vargas was qualified for this promotion because Vargas had complained about Woronka and filed the EEOC Charge.

The Sheriff Defendants do not respond to the merits of Vargas' argument that the failure to promote him was retaliation.  Instead, they contend that the Title VII retaliation claim was first raised in Vargas' response brief, and thus is waived.  This argument is unavailing.  Vargas' EEOC Charge indicates that one of its bases is retaliation.  Count I of the Complaint incorporates allegations that Vargas' requests for promotion to corporal were denied after he complained about Woronka and filed the EEOC Charge.  (*See* DE# 58-1 at 7, ¶¶50-51, 59; *see also id.* at 13, ¶ 94 (alleging in Count II that "Defendants denied Plaintiff's promotion to Corporal so as

to retaliate against Plaintiff for filing said complaints.").)
While Count I does not specifically mention retaliation, "it is
factual allegations, not legal theories, that must be pleaded in
a complaint." *Whitaker v. Milwaukee County, Wis.*, 772 F.3d 802,
808 (7th Cir. 2014). Moreover, as noted above, the Sheriff
Defendants acknowledged the existence of the retaliation claim in
their opening brief, arguing that Vargas had "no viable Title VII
retaliation claim" based on the merits of the claim. (DE #57 at
12.) Because the Sheriff Defendants had fair warning of this
theory of liability, Vargas did not waive it.

Vargas raises genuine issues of material fact as to the reason
he was not promoted to the rank of corporal. Therefore, the
Sheriff Defendants' motion for summary judgment is denied as to
the Title VII retaliation claim.

Counts II and III – 42 U.S.C. § 1981 Claims

Counts II and III assert claims against all defendants based
on 42 U.S.C. § 1981. Section 1981 guarantees that "[a]ll persons
within the jurisdiction of the United States shall have the same
right . . . to make and enforce contracts," regardless of race.
42 U.S.C. § 1981. Defendants contend that Counts II and III must
be dismissed because "[Section] 1981 does not create a private
right of action against state actors." *Campbell v. Forest Pres.
Dist. of Cook County, Ill.*, 752 F.3d 665, 671 (7th Cir. 2014).
Rather, Section 1983 "remains the exclusive remedy for violations

of § 1981 committed by state actors." *Id.; see Wilson v. City of Galesburg*, No. 416CV04025SLDJEH, 2016 WL 7408818, at *4 (C.D. Ill. Dec. 22, 2016) ("§ 1983 is the exclusive mechanism to vindicate violations of § 1981 by an individual state actor acting in his individual capacity"). Vargas does not respond to defendants' argument, and thereby waives any argument that he may assert claims based on Section 1981. *See Johnson*, 733 F.3d at 729; *Caruso*, 197 F.3d at 1197. Furthermore, because the Sheriff Defendants and Woronka were state actors, Vargas cannot assert claims based on Section 1981. Counts II and III are dismissed.

Count IV and V – 42 U.S.C. § 1983 Claims against Woronka

Counts IV and V assert claims against all defendants based on 42 U.S.C. § 1983, the Equal Protection Clause of the Fourteenth Amendment, and, by incorporation of the allegations in Counts II and III, 42 U.S.C. § 1981.[4] Woronka moves for summary judgment on these claims against him. To prevail on a Section 1983 claim, a plaintiff must show that he was deprived of a right secured by the Constitution or laws of the United States and that the deprivation

---

[4] Count V alleges a Section 1983 claim based on a failure to train Woronka. While not addressed by the parties, the Court notes that Vargas does not explain how Woronka could be held liable for failing to train himself. *See generally Sanville v. McCaughtry*, 266 F.3d 724, 739 (7th Cir. 2001) ("failure to train claims are usually maintained against municipalities, not against individuals").

was caused by a person "acting under color of state law." *Reynolds v. Jamison*, 488 F.3d 756, 764 (7th Cir. 2007).

Vargas argues that Woronka's assault and battery during the August 20 altercation form the basis of his Section 1983 claims against Woronka. He relies upon *Treiber v. Rompala,* No. 01 C 5049, 2002 WL 1467673 (N.D. Ill. July 9, 2002), in which a junior police officer sued another police officer alleging battery, illegal seizure and excessive force under Section 1983 and the Fourth Amendment. The complaint alleged that the defendant police officer intentionally terminated the plaintiff's movement when he grabbed and twisted her arm. *Id*. at *3. The defendant moved to dismiss the complaint. The court concluded that the complaint "alleged conduct during the parties' on-the-job interactions which could have been related to (although perhaps an abuse of) [the defendant's] duties as a higher-ranking police officer." *Id*. at *4. The court found the plaintiff had alleged an inappropriate seizure with excessive force by a state official acting under state law, but noted that "it was only with a broad reading and significant deference to Plaintiff that this court was able to characterize the incident as a potential constitutional violation." *Id.* at *5. The court granted qualified immunity to the defendant, explaining that "a reasonable officer in [the defendant's] position would not have considered that Plaintiff's

constitutional rights were in jeopardy when he allegedly grabbed and twisted her arm." *Id*. at *5.[5]

Like the defendant in *Treiber*, Woronka was an on-duty officer with a higher rank than Vargas at the time of the August 20 altercation. Despite this factual similarity, the Court finds *Treiber* to be distinguishable. *Treiber* addressed a motion to dismiss, rather than a motion for summary judgment. The standard for summary judgment is, of course, different from the standard for a motion to dismiss for failure to state a claim. *See Commissioning Agents, Inc. v. Long*, 143 F. Supp. 3d 775, 785 (S.D. Ind. 2015) ("[T]he 12(b)(6) standard is 'plaintiff friendly,' thus many claims survive a motion to dismiss only to be disposed of on summary judgment."). Unlike *Treiber*, Vargas does not claim that Woronka seized him in violation of the Fourth Amendment. Vargas asserts that Woronka should be held individually liable for the Section 1983 equal protection claims because he was on duty during the August 20 altercation, and Vargas was subordinate to him. He

---

[5] In response to *Treiber*, Woronka quotes extensively from the *Treiber* court's analysis of qualified immunity. He contends that his intent is critical to the "acting under color of state law" analysis, and maintains that he did not contemplate depriving Vargas of his constitutional rights during their altercation. To the extent Woronka attempts to argue a qualified immunity defense, this argument is waived because he did not assert this defense in his motion for summary judgment. *See Narducci v. Moore*, 572 F.3d 313, 324 (7th Cir. 2009) (noting defendants "waived the qualified immunity defense in the summary judgment proceedings because they failed to raise the issue before their reply brief").

relies on *David v. City and County of Denver*, 101 F.3d 1344 (10th Cir. 1996), in which the Tenth Circuit held that a plaintiff may be able to recover on her Section 1983 Fourteenth Amendment sexual harassment claim if she could establish that defendant officers "had supervisory authority over her or in some other way exercised state authority over her." *Id*. at 1354. Here, Vargas cites no evidence that Woronka had supervisory authority or exercised state authority over him.

Moreover, while Vargas maintains that Sections 1981 and 1983 protect against the misuse of power by an individual acting under color of state law, "every official abuse of power, even if unreasonable, unjustified, or outrageous, does not rise to the level of a federal constitutional deprivation. Some such conduct may simply violate state tort law or indeed may be perfectly legal, though unseemly and reprehensible." *McCoy v. Harrison*, 341 F.3d 600, 605 (7th Cir. 2003). Vargas maintains that his Section 1983 claims against Woronka are supported by evidence demonstrating "common law torts of assault and battery."[6] (DE #71 at 13.) He

---

[6] Vargas also argues in passing that the Complaint includes facts that support assault and battery claims, but the Court finds that the Complaint cannot fairly be read to include such claims. Generally, "[a] plaintiff may not amend his complaint through arguments in his brief in opposition to a motion for summary judgment." *Insolia v. Philip Morris Inc.,* 216 F.3d 596, 606 (7th Cir. 2000) (citation omitted). If Vargas wanted to amend the Complaint to include these claims, he could have sought leave to do so. He did not, so these claims will not be addressed.

fails to proffer evidence that Woronka's interaction during the August 20 altercation rose to the level of a deprivation of Vargas' constitutional rights. As such, this evidence fails to support the Section 1983 claims against Woronka.

Citing *Fane v. Locke Reynolds, LLP,* 480 F.3d 534 (7th Cir. 2007), Vargas argues that he satisfies the elements of a *prima facie* case of racial discrimination against Woronka because: 1) he is a member of a protected class; 2) he was meeting his employer's legitimate performance expectations; 3) he suffered an adverse employment action; and 4) other similarly situated employees who were not members of the protected class were treated more favorably. *See id.* at 538.[7] For an individual defendant to be liable under Section 1983, he must have participated directly in the constitutional violation. *Hildebrandt v. Ill. Dep't of Nat. Res.*, 347 F.3d 1014, 1039 (7th Cir. 2003) ("some causal connection or affirmative link between the action complained about and the official sued is necessary for § 1983 recovery"). Vargas does not proffer evidence of any adverse employment action for which Woronka was personally responsible. Woronka maintains that he had no

---

[7] The Court notes that *Fane* does not address Section 1983 claims, but rather, Title VII and Section 1981 claims. *See* 480 F.3d at 536. However, "[w]hen the plaintiff alleges intentional discrimination . . . the same standards in general govern liability under sections 1981, 1983, and Title VII." *Wuerffel v. Cook County Sheriff's Office*, No. 14 C 3990, 2016 WL 1660497, at *9 (N.D. Ill. Apr. 27, 2016) (citations omitted).

personal involvement with the alleged adverse employment actions of failing to promote or reassign Vargas, had no decision-making authority over Vargas' requests for promotions and assignments, and never made any recommendations regarding these requests. Vargas did not respond to this argument, and therefore waived it. *See Palmer*, 327 F.3d at 597–98; *Caruso*, 197 F.3d at 1197. Because Vargas fails to raise a genuine issue of material fact regarding Section 1983 claims against Woronka, Woronka's motion for summary judgment on Counts IV and V is granted.

## Count IV – 42 U.S.C. § 1983 Discrimination Claim against the Sheriff Defendants

The Sheriff Defendants move for summary judgment on Count IV, which asserts that they discriminated against Vargas in violation of Section 1983. "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that 'action pursuant to official municipal policy' caused their injury." *Connick v. Thompson*, 563 U.S. 51, 60–61, 131 S. Ct. 1350, 1359, 179 L. Ed. 2d 417 (2011) (quoting *Monell v. New York Dep't of Soc. Servs.*, 436 U.S. 658, 691, 98 S. Ct. 2018, 56 L.Ed.2d 611 (1978)). For a Section 1983 *Monell* claim, a plaintiff must "establish an official policy through (1) an express policy that causes a constitutional deprivation when enforced; (2) a widespread practice that is so permanent and well-settled that it constitutes a custom or practice; or (3) an allegation that the constitutional injury was

caused by a person with final policymaking authority." *Teesdale v. City of Chicago,* 690 F.3d 829, 834 (7th Cir. 2012) (citation and internal quotation marks omitted). While Vargas does not specifically address these requirements, he provides evidence that Buncich, as Sheriff, had final policymaking authority regarding officer promotions, and failed to promote Vargas.

Vargas maintains that he has established a *prima facie* case of racial discrimination claim against the Sheriff Defendants because: 1) he is a member of a protected class; 2) he was meeting his employer's legitimate performance expectations; 3) he suffered an adverse employment action; and 4) other similarly situated employees who were not members of the protected class were treated more favorably. *See Fane*, 480 F.3d at 538 (addressing Title VII and Section 1981 claims). Vargas relies upon evidence that Buncich denied that he was qualified to be promoted, despite the fact that he met Buncich's criteria for promotion to corporal. According to Vargas, a factfinder could reasonably infer that Buncich denied that Vargas was qualified for the promotion because he is Mexican.[8] However, Vargas fails to cite evidence demonstrating that similarly situated employees not in the protected class were

---

[8] Vargas also asserts that "evidence as to how Vargas was treated by the Command staff in general from 2011-August 20, 2012" supports his discrimination claim. (DE #69 at 18.) Because Vargas provides no support for this assertion, this perfunctory and undeveloped argument is waived. *See United States v. Hassebrock,* 663 F.3d 906, 914 (7th Cir. 2011).

treated more favorably.  Rather, the evidence indicates that Buncich promoted other officers of Mexican or Hispanic heritage to the rank of corporal.  Because Vargas fails to raise a genuine issue of material fact as to his discrimination claim, Count IV is dismissed.

## Count V – 42 U.S.C. § 1983 Failure to Train Claim against the Sheriff Defendants

Count V asserts that the Sheriff Defendants failed to adequately train Woronka with respect to racial discrimination in violation of Section 1983.  In certain circumstances, a municipality's decision not to train employees about their legal duty to avoid violating citizens' rights may rise to the level of a municipal policy for purposes of Section 1983.  *See Connick*, 563 U.S. at 61 ("A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train.").  To satisfy Section 1983, a municipality's failure to train its employees "must amount to deliberate indifference to the rights of persons with whom the [untrained employees] come into contact."  *Id*. (citation and internal quotation marks omitted).  "[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action."  *Id*. (citation omitted).

The record demonstrates that the Sheriff Defendants had several policies prohibiting racial discrimination.  Lake County

had a policy prohibiting any verbal or physical action in the workplace that is communicated or perceived as harassment. General Order 2000-06 prohibited harassment in any form, including racial and ethnic harassment. Both policies state that violators would be disciplined. Lake County's Equal Employment Opportunity Policy provided that discrimination by co-workers and supervisors would not be tolerated.[9] Vargas disputes the effectiveness of these policies, and argues that they are broad and general provisions rather than policies. The Court disagrees. While Vargas complains that the policies do not explain racial harassment or offer employees guidance regarding what to do if they believe they have been subjected to racial harassment, a review of the policies provides this information. For example, General Order 2000-006 explains that "[e]mployees expect to work in an environment free of intimidation, humiliation, insult, and offensive and verbal abuse," and encourages employees to report harassment immediately to "their supervisor and/or Sheriff or Chief." (DE #58-8; *see also* DE #58-6 (anti-violence in the workplace policy provides that employees should report threats to their supervisor or department

---

[9] The Equal Employment Opportunity policy also provided that meetings would be held at least annually to explain the intent of the policy and individual responsibility for effective implementation. Vargas proffers evidence that these meetings were not held, and that the Lake County Grievance Committee was dissolved, but fails to explain how this evidence supports his failure to train claim.

head).)  Vargas also contends that officers did not follow General Order 2000-006, which allegedly required them to inform the Sheriff of racial slurs and/or discriminatory policies.  While Buncich was not informed of Woronka's misconduct until after the August 20 altercation, Johnson and Vargas followed General Order 2000-006 by submitting their complaints to supervisors.

Vargas concedes that officers are required to go through training with respect to racial discrimination.  Because the officers receive some training, Vargas must show that the training program is so inadequate that the need for more training is obvious.  *See City of Canton v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 103 L.Ed.2d 412 (1989).  Vargas provides no details regarding the officers' training, and points to no obvious inadequacy in the anti-discrimination training program.  Rather, he proffers evidence that Woronka only attended the training twice, could not remember when he last attended the training, and only learned from it that "[t]imes have changed."  (DE #68-1 at 30.)  The fact "[t]hat a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the [municipality]."  *Canton,* 489 U.S. at 390; *see Palmquist v. Selvik*, 111 F.3d 1332, 1345 (7th Cir. 1997) ("In determining the adequacy of training, the focus must be on the program, not whether particular officers were adequately trained.").  "[I]t may be, for example, that an otherwise sound program has occasionally been

negligently administered," or that Woronka was an exceptionally poor student. *Ellis v. Country Club Hills*, No. 06-CV-1895, 2011 WL 1113032, at *6 (N.D. Ill. Mar. 24, 2011) (quoting *Canton*, 489 U.S. at 391).[10]

It is undisputed that the Lake County officers received anti-discrimination training. Vargas presents no evidence that any aspect of that training was inadequate. Therefore, there is no evidence that the Sheriff Defendants "had notice that further training was obviously necessary to correct an inadequacy in the officers' previous training." *Bell v. Vill. of Streamwood,* No. CIV.A. 10 C 3263, 2011 WL 4435664, at *10 (N.D. Ill. Sept. 6, 2011). The Sheriff Defendants' motion for summary judgment on Count V is granted.

Count VI – Indiana Constitutional Claim

All defendants assert that Vargas' claim under Article I, Section 23 of the Indiana Constitution must be dismissed because the Complaint seeks only monetary damages. "[N]o Indiana court has explicitly recognized a private right of action for monetary damages under the Indiana Constitution." *Smith v. Ind. Dep't of*

---

[10] Vargas also relies upon the Sheriff Defendants' failure to re-train Woronka after the August 20 altercation, and failure to place anything in Woronka's personnel file regarding the August 20 altercation. The Court notes that Woronka resigned shortly after the August 20 altercation, and finds that the lack of such evidence does not raise an issue of material fact as to the failure to train claim.

*Corr.*, 871 N.E.2d 975, 985 (Ind. Ct. App. 2007); *see McIntire vs. Franklin Twp. Cmty. Sch. Corp.*, 15 N.E.3d 131, 137 (Ind. Ct. App. 2014) (noting that "there can be no claim for monetary damages arising out of the Indiana Constitution"). Vargas does not oppose the defendants' motions as to this claim. Accordingly, Count IV is dismissed.

<u>CONCLUSION</u>

For the reasons set forth above, the Sheriff Defendants' motion for summary judgment (DE #56) is **GRANTED IN PART** and **DENIED IN PART**. The motion is **GRANTED** as to: (1) all claims against John Buncich; (2) the Title VII claims of sex discrimination, disparate impact, disparate treatment, training, and promotion in Count I; and (3) Counts II-VI against the Lake County Police Department. These claims are **DISMISSED**. The motion is **DENIED** as to the Title VII claims of hostile work environment and retaliation against the Lake County Police Department in Count I. Woronka's motion for summary judgment (DE #61) is **GRANTED**. Counts I-VI against Woronka are **DISMISSED**.


**DATED: September 27, 2017**     **/s/ RUDY LOZANO, Judge**
                                          **United States District Court**